**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-23-00215-CR**
_____

**DESHAUN MANUEL, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 252nd District Court**
**Jefferson County, Texas**
**Trial Cause No. F21-37551**

**MEMORANDUM OPINION**

A grand jury indicted Appellant Deshaun Manuel ("Appellant," "Manuel," or "Deshaun") for murder, for intentionally and knowingly causing the death of Jacoby Jackson by shooting him with a deadly weapon, namely a firearm. Appellant pleaded not guilty, but a jury found him guilty as charged and assessed punishment at thirty years' imprisonment. On appeal, Appellant challenges the sufficiency of the evidence to support the jury's rejection of Appellant's contention that he acted in self-defense. We affirm.

1

Evidence at Trial

Testimony of Law Enforcement and Affiliated Personnel

Sergeant Shawn Tolley of the Beaumont Police Department testified that he supervises 911 operations and is the custodian of records for the 911 center. He identified State's Exhibit 1 as recordings of calls to 911 on November 22, 2020, from a house in the 1600 block of Glasshouse Street in Beaumont, and the exhibit was admitted and published to the jury. The exhibit included recordings of numerous calls to 911 with reports of shots being fired in the street.

Officer Chancellor Vanhouten, a patrol officer with the Beaumont Police Department, testified that on the night of November 22, 2020, he was dispatched to a residence on Glasshouse Street in response to a call about a shooting. Vanhouten recalled that when he arrived, he saw a man lying in the street with his head bleeding, and the man was later identified as Jacoby Jackson ("Jacoby"), and it appeared Jacoby had gunshot wounds. Vanhouten testified that a lot of people were on the street, when he asked if any of them saw what happened, they told him they did not see anything. According to Vanhouten, the residence near the shooting is "a very well-known [] home that's used for parties all throughout the week[]" and "usually 50 to 100[]" people attend. Vanhouten identified State's Exhibit 2 as footage from his body camera that night, and the exhibit was admitted and published to the jury. Vanhouten testified that on the body cam video, he talks about shell casings, and

"bullets that were shot and fired[]" from a semi-automatic gun. Vanhouten testified that he recalled also seeing 9 mm casings at the scene.

Dr. Selly Strauch-Rivers testified that she is the chief forensic pathologist at Forensic Medical Management Services of Texas where she performs autopsies for several counties, and she performed an autopsy on Jacoby Jackson on November 30, 2020. Rivers testified that Jacoby had two gunshot wounds—one on the left side of his head, and another on his back—neither of which showed stippling. According to Rivers, when there is no stippling on a bullet wound, it generally is the result of a shot more than two feet away. She testified that the x-ray images she took showed two projectiles in Jacoby's body. According to the doctor, the wound to the back was not fatal, but the head wound "would be an immediately fatal wound," and the bullet ricocheted inside the skull. Rivers further testified that, based on the nature of the wounds, the two shots would have occurred "in very rapid succession[,]" but she could not tell which wound occurred first or whether the bullets were fired from the same gun. According to Rivers, the cause of Jacoby's death was a "gunshot wound to the head perforating the skull and brain[.]" Rivers removed the projectiles from the body and gave the projectiles to law enforcement. Rivers explained that a toxicology analysis performed by another lab showed "noncontributory substances" including caffeine and nicotine as well as delta-9 THC, methamphetamine, and

ethanol, in Jacoby's blood but she could not tell whether any of these substances would cause an individual to be more or less aggressive.

Michelle Ceja, a crime scene investigator for the Beaumont Police Department, testified that she was called to a scene on Glasshouse on November 22, 2020, where she took videos, and another technician took photographs. She agreed that the evidence gathered at the scene included shell casings and Jacoby's cell phone, and that some of the casings were silver but another was copper in color. Ceja recalled being told that the Glasshouse residence was the location for an after-hours house party.

Steve Mayes, a forensic scientist with the Jefferson County Regional Crime Lab, identified State's Exhibits 56 through 61 as photographs of a car the lab was asked to examine. Mayes testified that the lab recovered a gun from under the driver's seat, an empty plastic pistol case in the trunk, a magazine from a gun, and a backpack with a T-shirt inside that had blood on it. He also recalled a possible bullet defect in the rear passenger side taillight, and when they removed the taillight, they found a bullet.

Robert Baldwin testified that he is a private consultant on firearms and tool marks identification, and he worked with the Jefferson County Regional Crime Lab in 2020. He agreed that he did an examination in this case of several projectiles and casings gathered as evidence in this case, including twenty-nine fired cartridge

4

casings, but he did not receive any firearms for examination. Based on the number of casings submitted, Baldwin concluded there were at least nine semi-automatic firearms involved in the shooting.

Detective Heather Wilson with the Beaumont Police Department testified that on November 22, 2020, she was called to respond to a shooting at a residence on Glasshouse Street. When she arrived, a deceased person was lying in the road, and he was identified as Jacoby Jackson. She recalled that she observed numerous shell casings in the road. According to Wilson, although about twenty people were in the area, none of the people said they knew or saw what had happened. Wilson testified that when she arrived there was no weapon around Jacoby's body. Wilson also testified that Joseph Matthews turned himself in about a month after the shooting after he was found in Houston, and Deshaun turned himself in a couple of days after the shooting. Wilson testified that it is not unusual for shots to be fired on Glasshouse Street nor to find shell casings in the street. According to Wilson, a white Buick registered to "Lacey B." [1] was found a few days after the shooting.

Wilson agreed that she conducted an interview of Lacey on December 28, 2020, during which Lacey said that Deshaun stayed at her home and that she had seen a gun in his room. Wilson further testified that she conducted an interview of another person by the name of "Deanne" on November 25, 2020, during which

---

[1] We use pseudonyms to refer to witnesses not affiliated with law enforcement.

Deanne said that she had witnessed Deshaun approach Jacoby just before the shooting and she heard Deshaun tell Jacoby to go outside. According to Wilson, Deanne also told her that she saw Joseph Matthews and Deshaun shooting in the direction of Jacoby, and that Deanne saw Jacoby on the ground. Deanne also told Wilson that she saw Deshaun and Joseph get into a white Buick, and they were shooting as they drove off.

Detective Wilson identified State's Exhibit 62 as a recording of a video interview of Joseph Matthews that she conducted, and the exhibit was admitted into evidence and published to the jury. During the interview, Joseph said that Deshaun shot Jacoby once in the head, Jacoby fell to the ground, and then Deshaun shot him again. Joseph also states that some people were shooting at Deshaun. Joseph denied having anything to do with shooting Jacoby.

Testimony of Family and Friends

"Lina" testified that she knew the defendant because she had gone to high school with him. Lina testified that at the time of the shooting she had dated Jacoby for about six or seven months. She recalled that about a week before the shooting, she and Jacoby went to the residence on Glasshouse "to a house party that everybody goes to after the club." Lina testified that Deshaun was there, and he tried to start a conversation with her, but she told him she had a boyfriend who was watching her. According to Lina, when she came back from her car, someone was holding Jacoby

6

back trying to "de-escalate the problem[,]" Deshaun exchanged words with Jacoby, and she heard Deshaun say, "I'm not going to fight over a [woman]." Lina also testified that she, Jacoby, and Deshaun were at the Glasshouse residence the following Friday, too.

Lina testified that Jacoby went to the Glasshouse residence with a friend on November 22, 2020, at approximately 2 a.m., and she arrived with another friend at 2:45 a.m. According to Lina, as soon as she parked, she heard a gunshot, then there were three or four more shots, she heard some people say, "we got to go[,]" and she saw an SUV speed off. As Lina approached the house, she saw Jacoby's jacket on the ground, Jacoby was not moving, she saw the gunshot to his head and a gunshot on his side, and she started screaming. Lina testified that she called 911, and she turned Jacoby over so that he was lying on his back. Lina did not know who said, "we got to go." She did not see anyone with guns, and she did not see a weapon on or next to Jacoby.

Lina was later recalled to testify for the State, and she described Deshaun as "a genuine, fine, loving person[]" and a "jokester[.]" Lina knew that Deshaun carried a gun, and he would "make it known" that he had a gun by carrying it on his hip, but she also said he was more likely to fight than carry a gun. She agreed that partygoers at the Glasshouse residence would sometimes go outside and fire shots into the air. According to Lina, she heard the first gunshot when parking her car, and then as she

7

started walking, she heard three or four more shots. She testified again that she did not see a gun on or near Jacoby's body.

"Deanne" agreed that she did not want to testify, and she testified she had to be "arrest[ed]" to appear in court. She identified the defendant as Deshaun and stated that she knew of him although she did not "personally" know him, and she also agreed she knew Joseph Matthews.[2] According to Deanne, Deshaun and Joseph carried weapons and people called them "the hot boys[]" because they were hot-headed. Deanne also testified that she knew Jacoby Jackson, she knew about the shooting at the Glasshouse residence on November 22, 2020, and she testified that the residence was "a party house[]" where people would hang out after going to a club. Deanne testified that she saw Jacoby there the night he was killed. She also recalled seeing Deshaun and Joseph Matthews at the residence that night.

According to Deanne, about thirty minutes before the shooting, she was inside the residence and she saw Deshaun walk up to Jacoby and tap him on the shoulder, after which Deshaun and Jacoby went outside, but it did not look like any hostility was involved. She agreed that she told a detective that Deshaun had said to Jacoby, "Let me holler at you[,]" indicating that he needed to talk and get something off his chest or give him a piece of his mind, and "that's what Glasshouse [is] for, you go

---

[2] During his testimony later during the trial, Manuel referred to Joseph Matthews as his "co-defendant," although our appellate record does not include details about a prosecution of Matthews.

8

get your fights out[.]" Deanne testified that she saw Deshaun and Jacoby walk outside, she heard gunshots, and about five or ten minutes later, Joseph walked outside, and there were more shots. Deanne further testified that she saw Deshaun and Joseph fire weapons. Deanne recalled seeing Jacoby fall, and then Deshaun and Joseph were "running to the car while they [were] shooting[,]" but she did not see Jacoby with a weapon, and Deshaun fired into the air as they drove off. Deanne testified that she ran to Jacoby to see if he was okay, and when another woman "froze up[]" while calling 911, Deanne took the phone and started talking with 911. Deanne also testified that she did not see anyone pick up a weapon from Jacoby nor did she see a weapon near Jacoby.

On cross-examination, Deanne testified that she did not see any confrontation between Deshaun and Jacoby before the shooting, and she did not see any guns that night other than during the shooting. She recalled seeing Deshaun and Joseph shooting towards Jacoby while they were running to their car, and she did not see anyone else shooting. On redirect, Deanne testified that she did not know Jacoby to be the sort of person to shoot someone, and although she did not know Deshaun and Joseph personally, she had seen them with guns before.

"Chance" testified that Deshaun is his stepson, that he raised Deshaun, and he was involved in his life. Chance was aware of the shooting on November 22, 2020, and when he learned that Deshaun had been hurt, he tried to get Deshaun to go to a

hospital for medical attention. Chance recalled that Deshaun was at Janice's[3] house that night, and Chance and Chance's girlfriend Lacey drove to the house. According to Chance, sometimes Deshaun would stay with him and sometimes with Deshaun's children's mother. Chance testified that Lacey had never told him she found a gun under Deshaun's pillow, nor had she said she thought something bad was going to happen. Chance testified that Deshaun was shot in the upper part of his leg, but Deshaun did not go to the hospital because he was "discombobulated[]" and scared. Later, after Deshaun's mother arrived, Deshaun went to the hospital. Chance further testified that a lot of people were at the apartment that night, and he did not recall whether Joseph Matthews was there.

"Lacey" agreed that she did not want to testify, and she had to be "arrest[ed]" to appear in court. She identified the defendant as Deshaun Manuel, and she testified that, at the time of the shooting, she dated Deshaun's stepfather, Chance, and they shared a home together. Lacey testified that, about a month before the shooting, she found a gun in Deshaun's room, and she expressed concern to Chance. Lacey recalled that on the night of the shooting she and Chance were gaming at a store near their home. She recalled going to an apartment where Deshaun was with Chance sometime after the incident, and Chance told her Deshaun was shot. She testified

---

[3] "Janice" testified later in the trial that she and Deshaun have been in a relationship and Deshaun is the father of her children.

that she had owned a white Buick LeSabre that she sold to Deshaun, and she recognized the vehicle pictured in State's Exhibits 56 through 61 as the Buick she sold to Deshaun. She agreed she talked with a detective after the incident and that the Buick was still in her name even though she had sold it to Deshaun. Lacey testified that Deshaun's girlfriend Janice contacted her to ask if Lacey would keep the Buick at her house, but Lacey did not want it at her house after "it was involved in a murder[.]" Lacey testified that she did not tell the detective that Deshaun had put a gun in his backpack several times. She also testified that she did not tell the detective that Deshaun had a gun under his pillow.

"Janice" agreed that she did not want to testify, and that Deshaun is the father of her children. She testified that, at the time of the shooting, she and Deshaun were together on an "off and on[]" basis and sometimes stayed together. Janice recalled that, on the day of the shooting, Deshaun came by during the day with his cousin Joseph Matthews, and Deshaun was driving a white Buick that he had bought from Lacey, but he had not transferred the title to his name. Janice testified that Deshaun called her to say he had gone to a house party on Glasshouse with Joseph. Janice said she did not go to the party, and she stayed at her apartment all night. According to Janice, Deshaun came to her apartment early the next morning in the Buick, which Joseph was driving, and Deshaun "was in the passenger seat on the floor curled up." She further testified that Deshaun had been shot in the inner thigh, there was a lot of

11

blood, and she helped bring Deshaun into her apartment. Janice recalled that Deshaun was panicking and crying, but he did not tell her what happened, and he did not want to go to the hospital. Janice recalled that Chance and Lacey showed up and Chance tried to convince Deshaun to go to the hospital. She testified that she had never seen Deshaun with a gun, but that Joseph had two guns on him when he came to her apartment that night, and she did not know what he did with them. She also testified that she heard Joseph say something about a "Draco" gun. When asked what Joseph said when his mother arrived at her apartment that night, Janice replied,

> He said that they [were] on Glasshouse. They [were] partying, chilling. Jacoby approached Deshaun and asked him about his girlfriend. Deshaun told him he didn't fight [over] females. They tried to walk away from the situation. When they turned around, they [saw] Jacoby tussling with one of his friends to get a gun. And by the time they made it to the car and turned back around, Jacoby fired a shot, and Deshaun was shot.

According to Janice, Joseph said that Jacoby shot at them. Janice agreed that she told an investigator that Joseph grabbed a gun from Jacoby and that Deshaun had a gun "that you can put in your pocket." Janice testified that Deshaun never told her what happened on the night of the shooting and that Deshaun and Joseph did not tell her that Jacoby had died nor that they shot someone.

Testimony of Deshaun Manuel

Deshaun testified in his defense. He explained that there were after-hours house parties at the Glasshouse residence where "a hundred or more[]" people would

12

attend. Deshaun testified that he had been at the residence on Glasshouse the Friday before the shooting, and he saw Jacoby there. He agreed he approached Lina to talk with her, and Jacoby had told him not to talk with her saying to him, "leave my girl alone. That's my girl[,]" to which Deshaun responded, "my bad[.]" Deshaun testified that he did not have a gun with him, he told Jacoby he was not going to fight over a woman, and he did not have a grudge against Jacoby.

Deshaun recalled that he arrived at the Glasshouse residence at about 12:30 a.m. on the night of the shooting, and he saw Jacoby at about 1 or 1:30 a.m. Deshaun testified that his cousin, Joseph Matthews, was also there, and before Joseph went to the bathroom, Joseph slipped Deshaun a gun, which Deshaun put in his pocket. At some point, Deshaun felt someone shove against his shoulder, and when Deshaun looked up, he saw it was Jacoby who had bumped into him. Deshaun testified that he asked Jacoby what his problem was, and Jacoby responded that he wanted to fight, but Deshaun said he did not want to fight him over a woman. According to Deshaun, at that point, Jacoby went outside, and Deshaun went to Joseph and told him that Jacoby was gathering people and talking about him. Deshaun testified that he did not want to start any trouble, and he just wanted to leave.

Deshaun recalled that, as he and Joseph were leaving the house, Jacoby asked him, "[are] you going to take your fate or what?" which Deshaun interpreted to mean that Jacoby was going to fight. Deshaun told Jacoby he was not going to fight, and

13

Jacoby reached for a "Draco gun" from one of Jacoby's friends. Deshaun thought Jacoby was going to shoot him, and Deshaun feared for his life. After Jacoby got the Draco gun and turned around, Deshaun pulled the gun from his pocket and shot, and then Deshaun ran to his car. Deshaun testified that Joseph grabbed the Draco gun from Jacoby and started shooting it. According to Deshaun, when he got to his car, he was shot in the thigh, and he was bleeding. Deshaun testified that Joseph shoved him into his car, and then Joseph jumped into the car and "peeled off." Deshaun recalled that he went to the hospital about 8 or 9 a.m. that morning. Deshaun testified that he learned from his mother there was a warrant for his arrest, and he turned himself in on November 27. Deshaun testified that he did not have guns at Lacey's house, and he did not have a gun in his backpack because he did not carry a backpack.

On direct examination by defense counsel, the following exchange occurred:

Q: Okay, When you shot, did you feel like you had to do that to defend yourself?

A: Yes, sir.
. . . .
Q: What do you think would have happened if you wouldn't have shot Jacoby?

A: He'd have killed me.

On cross-examination, Deshaun agreed he had talked with Lina the Friday before the shooting, but he did not know that she was dating Jacoby, and on the night

14

of the shooting, Deshaun got a gun from Joseph. Deshaun believed that when he first shot Jacoby, he shot him in the head, and then Jacoby fell. According to Deshaun, after Jacoby fell, Deshaun ran to his car, and he did not stand over Jacoby and shoot him in the back. Deshaun agreed that people fired at him and Joseph as they ran to his car after he had shot Jacoby. Deshaun testified that he and Joseph then went to Janice's apartment, and he did not say anything about what had happened, and he did not know what Joseph did with the two guns he had.

Deshaun also testified that when Joseph told the police in his interview that Deshaun stood over Jacoby and shot him a second time, that was a lie. He further testified that what Deanne testified about him and Joseph carrying weapons was not true. As to the people that Deshaun thought testified untruthfully, Deshaun said, "I believe if they were telling the truth and they knew they were telling the truth, and they were doing what was right, they wouldn't have had been arrested to come here. They would have agreed to come in on their own." Deshaun testified that Joseph lied to keep himself out of trouble, and Joseph was not supposed to have a gun because he was on probation. Deshaun also testified as follows on further cross-examination:

Q: Jacoby didn't point a gun at you, did he?

A: He tried to.

Q: He didn't ever point a gun at you, did he?

A: No, sir.

The jury charge included an instruction on self-defense.[4] The jury found Deshaun Manuel guilty of murder as charged in the indictment. After a hearing on punishment, the jury assessed punishment at thirty years of imprisonment. Manuel timely filed a notice of appeal.

## Issue

In a single issue, Appellant argues that the evidence at trial was not sufficient for him to be found guilty beyond a reasonable doubt because he acted in self-defense. According to the Appellant, Jacoby Jackson had a problem with Appellant talking with Jacoby's girlfriend at the house party on Glasshouse Street. Appellant contends that after tension between the two men developed, Jacoby grabbed a firearm and turned to shoot Appellant, and Appellant then fired his weapon in self-defense because he feared for his life and safety.

## Standard of Review and Applicable Law

In reviewing the sufficiency of the evidence—including the evidence supporting a jury's rejection of a self-defense claim—we review all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Braughton v. State*, 569 S.W.3d 592, 607-08 (Tex. Crim. App. 2018); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App.

---

[4] Manuel does not challenge the jury charge on appeal.

2007). We give deference to the factfinder's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13. If the record contains conflicting inferences, we must presume that the factfinder resolved such facts in favor of the verdict and defer to that resolution. *Brooks v. State*, 323 S.W.3d 893, 899 n.13 (Tex. Crim. App. 2010) (citing *Jackson*, 443 U.S. at 326); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *see also Jackson*, 443 U.S. at 319 (the factfinder's responsibility is "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts[]"); *Murray v. State*, 457 S.W.3d 446, 448-49 (Tex. Crim. App. 2015) (citing *Hooper*, 214 S.W.3d at 12). The jury as factfinder is the sole judge of the weight of the evidence and credibility of the witnesses, and it may believe all, some, or none of the testimony presented by the parties. *See Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018); *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000); *Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995). The appellate court does not reweigh the evidence nor determine the credibility of the evidence, nor does it substitute its own judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

"Direct and circumstantial evidence are treated equally: 'Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and

circumstantial evidence alone can be sufficient to establish guilt.'" *Clayton*, 235 S.W.3d at 778 (quoting *Hooper*, 214 S.W.3d at 13). Each fact need not point directly and independently to the guilt of the defendant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Temple v. State*, 390 S.W.3d 341, 359 (Tex. Crim. App. 2013); *Hooper*, 214 S.W.3d at 13; *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993).

In a homicide case, the defendant's state of mind is a question of fact for the jury to determine, and the jury may infer intent "from any facts in evidence which it determines proves the existence of such intent to kill, such as the use of a deadly weapon." *Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003) (citing *Hall v. State*, 418 S.W.2d 810, 812 (Tex. Crim. App. 1967)). "It is both a common-sense inference and an appellate presumption that a person intends the natural consequences of his acts, and that the act of pointing a loaded gun at someone and shooting it toward that person at close range demonstrates an intent to kill." *Ex parte Thompson*, 179 S.W.3d 549, 556 n.18 (Tex. Crim. App. 2005) (internal citations omitted). Intent to murder can be inferred from circumstantial evidence, such as a defendant's acts, words, and the extent of the victim's injuries. *See Ex parte Weinstein*, 421 S.W.3d 656, 668-69 (Tex. Crim. App. 2014). Evidence of flight reflects on a defendant's consciousness of guilt of the crime charged. *See Yost v.*

18

*State*, 222 S.W.3d 865, 875 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) (citing *Bigby v. State*, 892 S.W.2d 864, 884 (Tex. Crim. App. 1994) (en banc)).

A person is justified in using force against another when and to the degree that person reasonably believes the force is immediately necessary to protect himself against another person's use or attempted use of unlawful force. *See* Tex. Penal Code Ann. § 9.31(a); *Gamino v. State*, 537 S.W.3d 507, 510 (Tex. Crim. App. 2017). A person is justified in using deadly force if he would be justified in using force under section 9.31, and he reasonably believed that deadly force was immediately necessary to protect himself against another's use or attempted use of deadly force. *Gamino*, 537 S.W.3d at 510; *see also* Tex. Penal Code Ann. § 9.32(a). The Penal Code defines the term "reasonable belief" to mean a "belief that would be held by an ordinary and prudent man in the same circumstances as the actor." Tex. Penal Code Ann. § 1.07(42).

Whether the defendant acted in self-defense is a question for the jury to decide. *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991). Where a defendant claims self-defense, the defendant bears the burden of production, which requires the production of some evidence that supports the defense. *See Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003) (citing Tex. Penal Code Ann. § 2.03; *Saxton*, 804 S.W.2d at 914). Once the defendant produces such evidence, the State then bears the burden of persuasion to disprove the defense. *Id.* The State is

not required to produce evidence that refutes the claim of self-defense, but it must prove its case beyond a reasonable doubt. *Id.* A jury is free to accept or reject the evidence of self-defense, and a jury verdict of guilty is an implicit finding against the defensive theory. *See id.*; *Saxton*, 804 S.W.2d at 914.

Analysis

Appellant testified that he shot Jacoby Jackson, and he believed his shot hit Jacoby in the head. Appellant also testified that after he shot Jacoby, he and Joseph drove away from the scene. According to Appellant, he felt that he had to shoot at Jacoby to defend himself, and if he had not shot Jacoby, Jacoby would have killed him. However, Appellant also testified that Jacoby did not point a gun at him. Appellant testified that Joseph lied when he told police that Appellant stood over Jacoby and shot him a second time, and Joseph was lying to keep himself out of trouble because he was on probation and not supposed to have a gun. Appellant also testified that Deanne was not truthful when she testified that Appellant carried guns. Appellant testified that he and Joseph left the Glasshouse area after the shooting. The jury could have disbelieved Appellant and could have believed the testimony of Joseph and Deanne. *See Febus*, 542 S.W.3d at 572; *Margraves*, 34 S.W.3d at 919. The fact that Appellant fled the scene is also circumstantial evidence from which a jury may infer consciousness of guilt. *See Devoe v. State*, 354 S.W.3d 457, 470 (Tex.

20

Crim. App. 2011) (citing *Alba v. State*, 905 S.W.2d 581, 586 (Tex. Crim. App. 1995)); *Bigby*, 892 S.W.2d at 884.

Detective Heather Wilson testified that, in her interview with Deanne, Deanne told her she saw Deshaun and Joseph shooting at Jacoby, she saw Jacoby on the ground, and Deshaun and Joseph were shooting as they drove away from the Glasshouse residence. In his interview with Detective Wilson, Joseph Matthews said that Appellant shot Jacoby, the first shot hit Jacoby in the head, and Appellant shot Jacoby again after Jacoby fell.

Lina testified that she heard gunshots as she arrived at the Glasshouse residence on the night of the shooting, and she saw a vehicle speed away. She also testified that she saw two gunshot wounds on Jacoby—one to his head, and another to his side. Lina testified that she did not see anyone with guns, and she did not see a weapon near Jacoby, although she knew Appellant carried a gun.

Deanne, Lacey, and Janice did not want to testify, and Deanne and Lacey agreed they testified because they were "arrested." Deanne testified that she was at the Glasshouse residence the night of the shooting, she saw Appellant and Jacoby walk outside, after which she heard gunshots, and when Joseph walked outside about five or ten minutes later, she heard more shots. She also specifically testified that she saw Appellant and Joseph fire weapons and run to the car after Jacoby fell. And she did not see a weapon near Jacoby. She also testified that she saw Appellant fire

21

a gun into the air as he and Joseph drove away from the scene. Lacey testified that she had seen a gun under Appellant's pillow, and she expressed concern to Chance, who was her boyfriend and Appellant's stepfather. She also testified that she did not tell law enforcement that Appellant had put a gun in his backpack several times, nor did she say Appellant had a gun under his pillow. Janice testified that she had never seen Appellant with a gun, but that Joseph had two guns on the night of the shooting.

In this case, the jury was presented with conflicting views about the shooting, and it had to decide the case based on which view it determined was more credible. *See Braughton*, 569 S.W.3d at 610. There is sufficient evidence in the record to rationally support the jury's rejection of Appellant's version of events. *See id.* at 611. The jury's decision to reject Appellant's claim of self-defense could have hinged on the credibility of the witnesses and the weight the jury decided to give to their testimony. *See Smith v. State*, 355 S.W.3d 138, 146 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (citing *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991)). The testimony of a defendant does not conclusively prove a self-defense claim. *Id.* Here, the jury chose not to believe Appellant's testimony. The State's witnesses, the physical evidence (including that no one found Jacoby had a gun after he was shot), and Appellant's flight from the scene undermine Appellant's claim of self-defense. We conclude that, based on the evidence presented at the trial, the jury could have rationally rejected Appellant's claim of self-defense and determined that

22

deadly force was not immediately necessary at the time Appellant shot Jacoby. *See* Tex. Penal Code Ann. §§ 9.31, 9.32; *Braughton*, 569 S.W.3d at 610-11. We conclude that the evidence is sufficient to support the jury's rejection of Appellant's self-defense claim, and we overrule his issue. *See Braughton*, 569 S.W.3d at 613.

Having overruled Appellant's issue, we affirm the trial court's judgment of conviction.

AFFIRMED.

LEANNE JOHNSON<br>
Justice

Submitted on May 3, 2024
Opinion Delivered July 24, 2024
Do Not Publish

Before Golemon, C.J., Johnson and Wright, JJ.